[Nos. 58717-0-I; 60082-6-I.   Division One.   March 10, 2008.]

THE STATE OF WASHINGTON, *Respondent*, v. CLARENCE ANDREW KINTZ, *Appellant*.

516

*Thomas M. Dunn* (of *Law Offices of Michael K. Tasker*), for appellant.

*David S. McEachran, Prosecuting Attorney*, and *Eric J. Richey* and *Hilary A. Thomas, Deputies*; and *Philip J. Buri* (of *Buri Funston Mumford, PLLC*), for respondent.

¶1 APPELWICK, C.J. — A person commits stalking by intentionally and repeatedly harassing or following another

person. RCW 9A.46.110. The stalking statute defines "repeatedly" as "on two or more separate occasions." RCW 9A.46.110(6)(e). Kintz argues that multiple encounters with an individual over a very short period of time are not encounters on separate occasions. Kintz also appeals joinder of the two charges, the admission of Evidence Rule (ER) 404(b) evidence, and the constitutionality of his sentence. We affirm.

*Facts*

¶2 Theresa Westfall was walking in Lake Padden Park with her three children and two dogs on December 21, 2005. As they were leaving the park on foot, she noticed a person parking a white van "that looked out of context . . . because most people at the lake are either walking their dogs or jogging, and this person was smoking a cigarette and sort of parking a van." The driver said something to Westfall as she walked by, but she did not understand him. Westfall thought he said something with the word "parking" in it, so she speculated that he thought her car was nearby and that he was repositioning his van so he would not block her car. She did not see the driver and also made a point of not looking at him. Westfall's car was not nearby, so she just ignored the driver and kept walking with her children and dogs.

¶3 The group walked down a trail that then emerges onto a road. When they came out onto the road, the van came up behind them, driving very slowly. The van drove next to them at a walking pace and eventually drove past them, out of eyesight. The van soon came from behind again and drove slowly past Westfall and her children, pulled into the trailer court parking lot, and turned around and drove toward them. By Westfall's count, the van drove past them at least five times. Eventually, the white van pulled up behind the group, drove past, and then sat at the stop sign where they had to cross the street. There was little traffic,

and according to Westfall, "he was obviously waiting for something, and I felt like he was following me, and I didn't want him to follow me home." After crossing the street, she stopped to call 911 and reported that a white van had been following her in the park. The operator told her to stay where she was and that an officer was in the area and would try to apprehend the person.

¶4 A police officer stopped a white van approximately five minutes after this report and within one mile of Westfall's location. Clarence "Chuck" Kintz was the driver. The officer advised Kintz that two women had called and said his behavior had scared them. Kintz responded that he was lost and looking for a friend's house. He also stated that he and his wife had argued so he had come to the park to "hang out." The police informed Kintz they would document the events and that he needed to leave and stay away from the park because he was scaring people.

¶5 On January 28, 2006, Jennifer Gudaz jogged on the narrow road around Lake Samish. She ran north in the southbound lane so that she could see oncoming traffic. She noticed a white van that drove past her, going south. Soon after, the van came from behind her and stopped next to her in the northbound lane. The driver of the van then asked her for directions to an address. Gudaz told him that she did not know the address and resumed jogging. Shortly after, she saw the same van sitting in the driveway of one of the nearby homes. Gudaz thought that the driver was a repairman who had finally found the correct house. But, he soon came up behind her, passed, and stopped a little ahead of her in the northbound lane. Once again, the driver asked for directions, but this time he did not provide an address or seem to know where he wanted to go. He merely said, "Get me out of here." The driver tried to hand Gudaz a clipboard out the window and wanted her to draw a map. Gudaz became frustrated because the driver did not know if he wanted to go north or south on the highway. She drew a rough map showing the route to the highway and then continued her jog. The white van drove away, out of sight.

¶6 Gudaz then saw the van a fourth time, sitting by the side of the road. The van pulled into the oncoming traffic lane next to her, facing the wrong way. The driver asked Gudaz if she needed a ride or needed money. Gudaz responded that she did not need a ride or money and ran away. When Gudaz lost sight of the van, she ran down a road toward the lake and hid between a fence and a shed. She estimates that she hid for about 10 to 15 minutes before she saw three bicyclists stopped on the road. She ran up to the bicyclists and asked for help. She was scared and crying. The bicyclists walked with Gudaz toward the county park, where one of them had a cell phone in her car. As they walked toward the park, they saw the white van drive slowly over a bridge and then speed up when the driver saw Gudaz and the bikers. The van drove quickly past the small group, so they all concentrated on remembering the license plate number. When they reached the park, Gudaz called the police and reported the encounters and license plate number. The white van was registered to Kintz's wife, Mary Kintz.

¶7 Based on these facts, the State charged Kintz with misdemeanor stalking using separate informations, one related to Westfall and one related to Gudaz. The State then moved to join the charges for trial. Despite Kintz's objection, the trial court joined the two counts and tried them together. During the trial, the court allowed two witnesses, Brigid Vonk and Nancy Nelson, to provide evidence of other bad acts as part of the case-in-chief. Another witness, Elizabeth Page, gave similar testimony as rebuttal. Kintz objected to the admission of this evidence of other bad acts under ER 404(b).

¶8 Brigid Vonk testified in the case-in-chief about an incident involving a man in a white van who pulled into her driveway and asked her for help finding an address. After she told the driver she did not know the address, he asked her to come with him to find it. She refused and went into her home. Vonk called the police two hours after the incident because she "had a very creepy feeling about the situation." She later identified Kintz in a photomontage.

¶9 Nancy Nelson also testified in the case-in-chief that a man driving a white van held a clipboard out the window and asked her to write down directions to an address while she was walking to work at Western Washington University. Nelson began describing and pointing the way to the address, but the driver insisted she write the directions. He kept pushing the clipboard out the window to her. He looked confused and did not listen to her oral directions. Finally, the driver said he would pull over and write down the directions himself. But, he drove away immediately, without stopping to write down the directions Nelson had provided. Nelson called the police and described the incident and driver, because she felt the incident was suspicious and made her uncomfortable. According to Nelson, "I felt very strongly that he wanted more than directions." An investigating officer thought that the description of the driver, van, and incident was similar to another case that had been reported involving Kintz. The officer showed Nelson a photomontage and she identified Kintz.

¶10 Finally, the trial court allowed Elizabeth Page to testify on rebuttal about her experience in Lake Padden Park on December 21, 2005. On the same day that Theresa Westfall walked in the park and encountered the white van, Page also saw a white van while she was standing in the parking lot with her dog. The van briefly parked next to her car and then left. As she was putting her dog in her car, the van pulled up behind her so that Page was between the two vehicles, next to the passenger door of the van. The driver waved at her to come around to his side of the car. Instead, Page told him to roll down the window. He gestured "almost aggressively" and repeatedly with his clipboard for her to come around to his window. He asked her where the other lake was—which she felt was an odd question since there is only one lake in the park. Page explained that there were two entrances but there was only one lake. Then she gave him directions to the main entrance. Page got into her car and observed the van leave the lot. The van did not follow her directions but parked in another lot. Page drove past

the van as she exited the park and noted the license plate. She waited at the exit of the park for five minutes to see if the van would leave the park. When the van never exited, she called the police because she believed his request for directions was implausible and suspicious.

¶11 In response to the evidence presented at trial, Kintz produced an expert witness, Elizabeth Nyblade, who testified that Kintz suffered from cognitive disorders including ADHD (attention deficit hyperactivity disorder). The jury convicted Kintz of both counts of stalking. The trial court sentenced him to 365 days in jail with 90 days' suspended sentence for each count.

## Discussion

### Repeatedly Harassed or Repeatedly Followed

¶12 The stalking statute reads, in pertinent part, that "[a] person commits the crime of stalking if, without lawful authority and under circumstances not amounting to a felony attempt of another crime: (a) [h]e or she intentionally and repeatedly harasses or repeatedly follows another person. . . ." RCW 9A.46.110(1). The statute defines "repeatedly" as "on two or more separate occasions." RCW 9A.46-.110(6)(e). Kintz contends the encounters charged do not amount to separate occasions because each charge resulted from multiple contacts over a very short period of time.

¶13 According to both Kintz and the State, we should review this claim for sufficiency of the evidence. But, the facts of Kintz' contacts with the women are undisputed[1]—he drove past Westfall and Gudaz several times. The dispute concerns whether these contacts occurred on two or more separate occasions with respect to each victim or whether they were merely ongoing contacts on the same occasion. Whether the evidence is sufficient turns on the

---

[1] In this portion of his brief, Kintz does not dispute identity as he does in section II below (unpublished).

legal meaning of "separate occasion." Therefore, the initial inquiry is an issue of law, which we review de novo. *State v. McCormack*, 117 Wn.2d 141, 143, 812 P.2d 483 (1991).

¶14 Neither the statute nor case law provides a definition of "separate occasions." Undefined terms are given their plain and ordinary meaning unless a contrary legislative intent appears. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 813, 828 P.2d 549 (1992). *Webster's Third New International Dictionary* 1560, 2069 (1969) defines "occasion" as "a particular occurrence : HAPPENING, INCIDENT"; "separate" is defined as "set or kept apart," "not shared with another : INDIVIDUAL, SINGLE," autonomous, independent, distinct, and different. Based on these definitions, a "separate occasion" is a distinct, individual, noncontinuous occurrence or incident. Thus, if Kintz had several individual incidents with Gudaz and Westfall, his activities meet the plain meaning of "separate occasions."

■ ¶15 Given the nature of the stalking in this case—repeated incidents of physical proximity with visual and/or verbal contact—the trial court concluded Kintz's conduct satisfied the "separate occasions" requirement of the statute.

> There's time, space between those incidents, not a lot, obviously but time, space. There's a period of time where Mr. Kintz and the alleged victim are not even in the same, in sight of each other, in the same or close proximity. They're separated both physically by sight and over time, and he comes back and makes contact again.
>
> . . . .
>
> [W]e have separate, discrete, levels of contact, separated by periods of time where the parties are not in contact and where the parties are, in fact, physically and visually separated. That constitutes to me the second time and the third time for a repeat under the purposes of the statute.

We agree with the trial court's reasoning. The legislature could have defined "separate occasions" as separate days or dates or as separated by a minimum time period, but it did

not do so. This suggests that the legislature did not intend a stalking charge to hinge on a predefined interval of time between incidents.

¶16 Here, Kintz repeated his visual and verbal contact with each victim on separate occasions. For each of the charges, Kintz had several discrete encounters with his victims. Gudaz testified that she saw Kintz at least five times. Each time he either drove by her or stopped to talk to her and then drove out of eyesight. These breaks in contact, with time and distance between Kintz and Gudaz, separated the encounters into individual events. Similarly, Westfall saw Kintz in the parking lot and then lost sight of him when she walked down the trail. When she lost sight of Kintz, this particular incident ended. As soon as she emerged onto the road, the white van came up behind her, marking another encounter. These are two, individual encounters. Each contact between Kintz and his victims constitutes a separate occasion.

¶17 Therefore, we conclude the trial court did not err in interpreting the repeated contact provision of the statute or in finding that sufficient evidence supported a conclusion that Kintz had contact with the victims on separate occasions as contemplated by the statute.

¶18 A majority of the panel having determined that the remainder of this opinion will not be printed in the Washington Appellate Reports but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.

AGID and SCHINDLER, JJ., concur.

Reconsideration denied April 30, 2008.

Review granted at 165 Wn.2d 1011, 1012 (2008).